# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY DEAN DELL'ANTONIA, | CASE NO. 1:00-cv-06602-LJO-SMS PC |
| Plaintiff, | ORDER STRIKING SURREPLY AND SUPPLEMENTAL OPPOSITION |
| v. | (Docs. 192 and 196) |
| STATE OF CALIFORNIA, et al., | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| Defendants. | |
| | (Doc. 174) |
| _____/ | |

I.      Order Resolving Defendants' Motion for Summary Judgment

  A.      Procedural History

        Plaintiff Danny Dean Dell'Antonia ("plaintiff") is proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on plaintiff's third amended complaint, filed March 12, 2002, against defendant Edger for use of excessive force, and defendants Grayson and Snow for acting with deliberate indifference to plaintiff's serious medical needs, in violation of the Eighth Amendment.[1]  (Docs. 43, 53.)  At the time of the events at issue in this action, plaintiff was a state prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and was housed at the California Substance Abuse Treatment Facility and State Prison-Corcoran ("CSATF") in Corcoran, California.

---

[1] Plaintiff filed supplements to his third amended complaint on October 3, 2002, July 1, 2003, and January 7, 2005.  (Docs. 52, 79, 119.)

1

Defendants Edger, Grayson, and Snow ("defendants") filed a motion for summary judgment on April 17, 2006, plaintiff filed an opposition on May 15, 2006, and defendants filed a reply on May 17, 2006.[2] (Docs. 174-182.)  Accordingly, defendants' motion for summary judgment was deemed submitted on May 17, 2006.  Local Rule 78-230(m).  However, on May 30, 2006, plaintiff filed a surreply, to which defendants filed an objection on May 30, 2006. (Docs. 191, 192.)  Plaintiff filed a response to defendants' objection on June 19, 2006.  (Doc. 194.)  On December 4, 2006, more than six months after defendants' motion for summary judgment was deemed submitted, plaintiff filed a supplemental opposition.  (Doc. 196.)  Defendants filed an objection on December 4, 2006, and plaintiff filed a response on December 11, 2006.  (Docs. 195, 197.)

Neither the Federal Rules of Civil Procedure nor the Local Rules provide a right to file a surreply.  Plaintiff did not seek and was not granted permission to file a surreply and the surreply shall be stricken from the record.  Further, plaintiff may not simply file a supplemental opposition at his discretion.  Indeed, in an order issued on May 17, 2006, the Magistrate Judge denied plaintiff leave to file a supplemental opposition at a later date. (Doc. 189.)  Because plaintiff was not granted permission to file a surreply or a supplemental opposition, they shall be stricken from the record.

    B.    Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon

---

[2] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on January 10, 2003.  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (Doc. 57.)

1  motion, against a party who fails to make a showing sufficient to establish the existence of an

2  element essential to that party's case, and on which that party will bear the burden of proof at trial.

3  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

4  case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

5  should be granted, "so long as whatever is before the district court demonstrates that the standard

6  for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

7          If the moving party meets its initial responsibility, the burden then shifts to the opposing

8  party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

9  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

10  of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

11  required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

12  material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586

13  n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

14  might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

15  U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

16  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

17  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

18  (9th Cir. 1987).

19          In the endeavor to establish the existence of a factual dispute, the opposing party need not

20  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

21  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

22  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

23  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

24  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

25  amendments).

26          In resolving the summary judgment motion, the Court examines the pleadings, depositions,

27  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).

28  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

1   inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

2   opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

3   (1962) (per curiam).   Nevertheless, inferences are not drawn out of the air, and it is the opposing

4   party's obligation to produce a factual predicate from which the inference may be drawn.   Richards

5   v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

6   Cir. 1987).

7            Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

8   that there is some metaphysical doubt as to the material facts.   Where the record taken as a whole

9   could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

10   trial.'"   Matsushita, 475 U.S. at 587 (citation omitted).

11         C.    Undisputed Facts[3]

12            1.    Medical Background Facts

13   1.      An x-ray taken on April 27, 1999, showed that plaintiff's heart size was within normal limits.

14   2.      On April 30, 1999, plaintiff was discharged from San Joaquin Community Hospital

15          ("SJCH").   Plaintiff's cardiac enzymes were negative, and plaintiff's Persantine stress

16          thallium test was negative.   Plaintiff was stable and discharged back to infirmary.

17   3.      On July 26, 1999, plaintiff stated that in 1992, he had surgery wherein a small nodule was

18          taken out of his left shoulder.

19   4.      On August 29, 1999, plaintiff complained of chest pain, shortness of breath, and pain

20          radiating to the left side of the neck and down to the left arm.   Plaintiff was sent to infirmary

21          for evaluation and treatment.

22

---

23       [3] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth

24   by defendants as undisputed in compliance with Local Rule 56-260(b).   Further, plaintiff did not tender any evidentiary objections in any other form.   FDIC v. New Hampshire Ins. Co., 953 F.2d 478, 484 (9th Cir. 1992) (evidentiary defects waived absent objection).   Therefore, defendants' statement of undisputed facts is accepted

25   except where brought into dispute by plaintiff's verified third amended complaint.   Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal

26   knowledge of specific facts which are admissible in evidence).   A verified opposition to a motion for summary judgment may also be considered as an opposing affidavit for purposes of the summary judgment rule if it is based

27   on facts within the pleader's personal knowledge.   Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998).   However, neither plaintiff's opposition nor plaintiff's supplemental complaints were verified and they cannot be

28   treated as opposing affidavits.   Moran v. Selig, 447 F.3d 948, 759-60 (9th Cir. 2006).

5.   On August 29, 1999, plaintiff complained of a tearing-like pain from his left chest to his shoulder.

6.   On September 2, 1999, plaintiff stated that he had his left testicle removed for cancer in 1993.  However, during examination it was noted that both of plaintiff's testicles were present.

7.   On September 2, 1999, plaintiff was discharged from the North Kern State Prison Correctional Treatment Center ("CTC").  Plaintiff was observed overnight at CTC following his discharge from SJCH, where he had been admitted for chest pain.  All tests including an electrocardiogram and enzyme studies were negative, and the diagnosis was atypical chest pain.

8.   On October 26, 1999, plaintiff reported that cancer was taken from his left shoulder.

9.   On November 4, 1999, plaintiff complained of sudden pain in his head, became short of breath, and passed out. Plaintiff was taken to the Emergency Room ("ER") by ambulance.

   2.   <u>Facts Relating to Claim Against Defendant Linda Grayson</u>

10.   At all times relevant to this dispute, Linda Grayson was a duly licensed Medical Technical Assistant ("MTA") employed by CDCR at CSATF.

11.   It is standard procedure that inmates needing to go to the CTC ER be transported by vehicle.

12.   During the day, when an inmate located at CSATF requires nonemergency medical treatment at the CTC, one of the facility correctional officers is contacted.  The facility correctional officer escorts the inmate to the CTC, and stays with the inmate during the inmate's visit to the CTC.

13.   After the inmate's medical appointment and/or medical treatment at the CTC, the facility correctional officer will escort the inmate back to CSATF.

14.   If an inmate is in a wheelchair and requires non-emergency medical treatment at the CTC, a CTC transportation correctional officer is contacted.  The CTC transportation correctional officer picks up the inmate and takes the inmate via vehicle from CSATF to the CTC.

///

///

15. After the inmate's medical appointment and/or medical treatment at the CTC, if the inmate is in a wheelchair, the CTC transportation correctional officer is contacted to pick up the inmate at the CTC and transport the inmate back via vehicle to CSATF.

16. The inmate is, at all times, escorted between CSATF and the CTC by a correctional officer for security purposes. Inmates are prohibited from walking or self-propelling in a wheelchair to and from CSATF and the CTC without an escort by a correctional officer. In addition, inmates must be "processed" (i.e., required to go through metal detectors, and undergo an unclothed body search) through several gates between CSATF and CTC. An inmate would not be able to be processed through these gates without being escorted by a correctional officer.

17. If an inmate requiring nonemergency treatment at CTC wants to walk and/or self-propel in his wheelchair, he may do so, but he must be escorted by a correctional officer at all times.

18. During the day or night, an inmate located at CSATF requiring emergency medical treatment is transported to the CTC by medical staff via the Emergency Response Vehicle ("ERV"). Medical staff drive the ERV and accompany the inmate to the CTC, with a correctional officer escort.

3.    Facts Relating to Claim Against Defendant Benjamin Edger

19. At all times relevant to this dispute, Benjamin Edger, Jr. was a duly licensed registered nurse employed by CDCR at CSATF.

20. On January 23, 2000, at approximately 4:42 p.m., defendant Edger responded to plaintiff's dorm for an emergency medical call.

21. Upon arriving at plaintiff's dorm, defendant Edger found plaintiff prone (face down) on the floor, unresponsive, and with high colour (flushed).

22. Defendant Edger found an empty nitroglycerin bottle lying on the floor. Defendant Edger then checked plaintiff. Plaintiff was unresponsive.

23. Defendant Edger followed the standard basic life support and advanced life support guidelines, and tapped plaintiff with his hand on plaintiff's left scapula (shoulder blade), and asked, "Are you okay?  Are you okay?"

24. Plaintiff became responsive shortly thereafter, and stated to defendant Edger, "The last thing I remember is this bolt of pain [in my chest]." Plaintiff was then transported to the emergency room for treatment.

### 4. Additional Medical Background Facts

25. On August 11, 2000, plaintiff complained of numbness in left arm that started at his fingertips the night before and moved to left shoulder. Plaintiff stated that he had an MI (myocardio infarction) in 1997 with the same symptoms. Plaintiff was sent to the CTC ER for further evaluation.

26. On August 17, 2000, plaintiff complained of numbness of left forearm on the radial aspect from the elbow down. The shoulder was completely normal with no numbness.

27. On October 1, 2000, plaintiff complained of weakness, but denied any chest pain or shortness of breath. Plaintiff had strong, even radial pulses and no radial edema, his blood pressure was strong and regular, and he had equal strength on all extremities. Plaintiff returned to his cell wheeling his wheelchair. Later in the day plaintiff was observed going around the yard with another inmate pushing him and was able to use both arms, with no symptoms of distress.

28. On January 16, 2001, plaintiff was seen at SJCH, where he complained of chest pain over the anterior chest area with numbness of the left arm. A SJCH Radiology Report stated heart size top normal, no definite focal infiltrate identified, no vascular congestion noted, and no acute cardiopulmonary process identified. A radionuclide myocardial perfusion scan was performed. On both the stress and resting images, the myocardium was found to be intact throughout, without photopenic defect to suggest an infarct or ischemia. There was no stress-induced left ventricular dilation. The impression was no scintigraphic evidence of an infarct or ischemia. It was noted on the SJCH discharge summary that during plaintiff's admission to SJCH between January 16, 2001 and January 20, 2001, he initially refused the stress thallium tests. However, the test had to be performed the next day, and the results of the stress thallium test were negative.

///

7

29. On November 9, 2001, plaintiff was sent to SJCH ER complaining of chest pain. Upon exam, the electrocardiogram was unremarkable, and the chest x-ray revealed no acute inflammatory process, but left ventricular enlargement was noted. The Persantine thallium stress test and angiography earlier in the year were normal.

30. On January 17, 2002, Dr. Deering noted that there was no evidence of significant structural heart disease.

31. On March 24, 2002, plaintiff was sent to SJCH because of his complaint of chest pains. The discharge diagnosis was noncardiac chest pain. Dr. Brijesh Bhambi recommended no additional cardiac work-up for plaintiff in the near future unless there was an objective change in his clinical status.

     5.   Facts Relating to Claims Against Defendant Sharon Snow

32. At all times relevant to this dispute, defendant Snow was a duly licensed medical doctor employed by CDCR at CSATF.

33. As a staff physician at CSATF, defendant Snow's duties were to evaluate the health care concerns of inmates/patients, and provide or request appropriate medical treatment to them while applying CDCR approved criteria for the provision of health care. Defendant Snow also directed other institutional medical staff, such as nurses and MTAs, in the provision of medical care to inmates/patients.

34. Plaintiff was on A yard for about 6 months and defendant Snow was responsible for his medical care.

35. During a seven month time period in 1999, plaintiff made thirty three visits to medical clinics, emergency rooms and hospitals mostly for symptoms of heart attack. No heart attack and no positive tests for heart disease were ever found.

36. The 1999 blood pressure and pulse abnormalities are similar to ones found in 2001 for all hospital and emergency rooms visits (e.g., show the same pattern of abnormalities).

37. In 1999 - 2000, plaintiff claimed he had cancer of the testicles, and metastatic bone lesions in left shoulder and right thigh, that were removed by a Navy surgeon (1991-1992). An MRI

///

8

1    showed a mild shoulder separation due to joint surface thickening (i.e., "old age" changes)

2    in 2002.

3    38.    Bone metastasis are never removed surgically, and multiple examiners have noted "2 normal

4    testicles present," as well as an ultra-sound exam showing normal testicles.  The testicular

5    cancer and bone metastasis are related issues.  Plaintiff did not have testicular cancer,

6    therefore he would not have any resultant "bone metastasis" from a cancer that did not exist.

7    39.    Between 1999 and 2004, no electrocardiogram, chest x-ray, angiogram, and/or, most

8    tellingly,  any echocardiograph or Persantine-thallium stress test ever showed congestive

9    heart failure, a heart attack (old or new), cardiomyopathy, or indeed any heart defect

10   whatsoever.

11   40.    Plaintiff claimed that he got his congestive heart failure from a heart attack in 1997, exposure

12   to plutonium, and alcoholic cardiomyopathy, and denied ever drinking or smoking.

13   41.    The only common feature of all of plaintiff's hundreds of complaints of heart disease is chest

14   pain.

15   42.    Upon examination, plaintiff is found with low blood pressure and fast heart beat, which

16   correct within thirty to forty-five minutes and without any additional nitroglycerin or nitrate

17   paste.

18   43.    Plaintiff had always had a personal supply of (1) nitroglycerin, (2) a strong vasodilator to

19   lower blood pressure (isosorbide), and (3) Digoxin, which slows heart rate if taken daily to

20   achieve a "therapeutic" blood level (0.8-1.2 nanograms / milliliter).  Plaintiff's blood Digoxin

21   levels were sub-therapeutic on every admission to hospital.

22   44.    Plaintiff's medication use accounts for plaintiff's fast heart beat.  If nitroglycerin tabs were

23   taken, the blood pressure would decrease.  As the nitroglycerin wore off, generally in twenty

24   to thirty minutes, the blood pressure would normalize (head toward 120/70 to 130/80) and

25   the pulse rate, caused by the low blood pressure returning to normal, would decrease - the

26   exact pattern defendant Snow observed in all of plaintiff's medical records.

27   45.    In 2000, prior to defendant Snow's arrival, plaintiff was charged with hoarding medications

28   by storing them in his locker.  Correctional officers found empty medicine bags as well as

9

1  several partly full bags.  The different types of pills included captopril, a blood pressure

2  medication to lower blood pressure, and pseudoephedine, which speeds up heart rate while

3  causing a racing pulse.

4  46.  Defendant Snow believed that plaintiff was creating these abnormal low blood pressures and

5  fast heart beat by not taking his Digoxin and taking three or more nitroglycerin tablets

6  immediately prior to presenting with chest pain.  When a normal person has a heart attack

7  it is common for blood pressure to decrease and/or the pulse rate to fall.

8  47.  On January 3, 2001, defendant Snow renewed plaintiff's pain medication, Indocin.  No

9  doctor visit was needed for simple medication renewals.

10 48.  On January 16, 2001, plaintiff came to A yard medical clinic complaining of fast heart beat,

11 chest "heaviness" and tingling fingers.  He told defendant Snow he had congestive heart

12 failure from radiation injury.  Defendant Snow rendered immediate and prompt medical

13 treatment with oxygen, did a physical, and called the prison emergency room with further

14 orders and treatment.  Defendant Snow told the nurse to make hospital contact so plaintiff

15 could get definitive care and treatment without delay.  At the time, defendant Snow believed

16 plaintiff might be having a heart attack.

17 49.  At the prison emergency room, which is ten minutes from A yard, plaintiff received oxygen,

18 nitroglycerin tabs, cardiac monitoring, and intra-venous morphine sulfate, and then quick

19 ambulance transport to SJCH in Bakersfield.

20 50.  Plaintiff's electrocardiogram showed no signs of heart attack (Myocardial Infarction) or even

21 ST-T wave changes that accompany heart pain called Angina (or "coronary artery disease").

22 51.  Plaintiff returned from SJCH on January 20, 2001.  After a few hours, he again complained

23 of severe chest pain and said that he could not breathe.  He was promptly sent by ambulance

24 to Corcoran District Hospital ("CDH").  Plaintiff was observed at CDH for forty-eight hours

25 without any evidence of heart failure or heart attack, and the physician charged with finding

26 a reason for the forty-eight hour admission and observation stated plaintiff had (1) asthma

27 and (2) a "flash" of congestive heart failure.

28 ///

52.   However, on January 22, 2001, an examination showed a clear chest and the CDH doctor finally released plaintiff back to the prison stating he could find no cause of plaintiff's symptoms.

53.   Defendant Snow saw plaintiff at the prison clinic for the second time on January 24, 2001.

54.   Defendant Snow noted plaintiff's vital signs to be quite normal (blood pressure 118/86, pulse 68, and respiratory rate 16).  He had been in hospital(s) continuously for the past seven days and could only take medication he was given at the hospital.  He could not possess his own nitroglycerin, and the nurse would stand by him and watch to insure that he did take the Digoxin.

55.   On January 29, 2001, defendant Snow saw plaintiff in the medical clinic and found his lungs to be very congested with a respiratory infection, but he had no chest pain or signs of congestive heart failure.  Defendant Snow treated him with Keflex antibodies and Cepacol cough/sore throat preparation, and ordered him to return in one week.

56.   Defendant Snow re-ordered plaintiff's cold and cough medications (Cepacol) plus comfort items Guaifenosin (cough syrup) and Tylenol on February 12, 2001.  Plaintiff did not return to the clinic for his scheduled follow-up exam.

57.   On February 22, 2001 plaintiff showed up at medical clinic telling defendant Snow he had to go to the "hospital" last night with chest pain and shortness of breath.  His exam revealed normal chest sounds and heart sounds (i.e., no congestive heart failure).

58.   On February 22, 2001, plaintiff went to the prison ER and was promptly sent back to the yard when his oxygen saturations were 95-98%.  Defendant Snow believed that plaintiff was feigning the shortness of breath because an oxygen saturation of between 95% and 98% indicates that the patient's heart and lungs are working correctly.

59.   By the beginning of March 2001, defendant Snow had reviewed all of plaintiff's medical records from the prison files.

60.   Defendant Snow suspected he was using his heart medications to create his abnormal vital signs (low blood pressure and fast heart beat).  Defendant Snow believed plaintiff would not take his Digoxin.  Plaintiff's blood levels were always low when he went to a hospital, but

1  normal when he came back.  His abnormal blood pressures and pulses would also be normal

2  with observation time and immediately after hospital discharge.

3  61.  Defendant Snow did not believe plaintiff required a wheelchair or braces, and that he sat in

4  wheelchairs when he could get them, until his muscles atrophied.  Sitting was causing

5  deconditioning of plaintiff's lungs and heart, as he had chronic obstructive lung disease and

6  very high cholesterol.

7  62.  Defendant Snow requested that plaintiff's wheelchair be removed from his use through

8  Sergeant Aiken, who recorded a 128B (informational chrono) for that date.  Defendant Snow

9  did not speak to plaintiff on March 7, 2001.

10  63.  Defendant Snow saw plaintiff on March 8, 2001, by appointment.  Defendant Snow had

11  apprized Captain Frazier that plaintiff had a medical psychiatric problem that caused him to

12  fabricate a lot.  Captain Frazier accompanied defendant Snow to clinic and plaintiff was

13  confronted by defendant with some of the realities from his medical records at the time (no

14  testicle cancer, no radiation for cancer, no surgery for cancer, no non-functioning knees

15  requiring a wheelchair or braces, no heart disease, heart attacks).  Defendant Snow advised

16  that plaintiff needed to begin that day to give only factual medical history.

17  64.  Defendant Snow wrote the content of the conversation, put his wheelchair and leg brace

18  removal of March 7, 2001, in writing, and told plaintiff he would not be allowed to take his

19  Digoxin on his own but would have to go to pill line to take it in front of a nurse/MTA, who

20  would make sure he swallowed it.

21  65.  Defendant Snow urged plaintiff to walk as often as possible to improve his muscles, heart

22  and lungs, as she felt this would much improve his overall physical conditions, including his

23  weight and cholesterol issues.

24  66.  On April 17th and 18th of 2001, the MTA recorded plaintiff's angry claim that he filed a

25  "restraining order," which he had no copy of.  Plaintiff then missed his April 18, 2001,

26  appointment with defendant Snow and did not receive his pulmonary (COPD) referral which

27  defendant had arranged to treat his real diseases (lung and lipid).

28  ///

12

67. Between March 5, 2001, and May 10, 2001, plaintiff did not get admitted to any treatment center (ER, clinic, hospital) for chest pain. On May 10, 2001, plaintiff claimed that he fainted. Defendant Snow continued all his cardiac medications and added two medications - lopid and pravachol to lower his blood lipids.

68. Defendant Snow discontinued Isordil which she believed caused the fainting episode, and ordered six blood pressure measurements on the yard. Plaintiff did not show up for the blood pressure checks and requested transfer to another yard.

69. Plaintiff was sent to another yard on July 30, 2001. Defendant Snow last dealt with plaintiff on December 2, 2001, and ordered a laxative (magnesium sulfate) for him.

70. After plaintiff left A yard, he began going out to hospitals and emergency rooms with chest pain.

71. An echocardiographic consultation and more cardiac consults were negative, and his echocardiographic ejection fraction of 60% was again normal. The cardiac consultant diagnosed (1) a probable borderline personality disorder and (2) no evidence of any heart disease.

72. Plaintiff was examined and treated numerous times for his complaints of his heart, shoulder, and other health issues, and he was further seen by doctors and specialists on several occasions between 1999 and 2004. During 1999 and 2004, plaintiff's medical condition and various health issues were carefully monitored and treated by several physicians, including defendant Snow, both inside and outside the institution. In six years of intensive investigation by multiple specialists, no heart disease was found up to 2004.

///

///

///

///

1    D.    Discussion[4]

2         1.    Medical Care Claim Against Defendant Grayson - 1999

3    In his third amended complaint, plaintiff alleges that on November 12 or 13, 1999, defendant

4    Grayson, an MTA, ordered him to self-propel his wheelchair over 3/4 of a mile to the CTC ER for

5    an appointment, despite knowing about plaintiff's cardiac condition of congestive heart failure, in

6    violation of the Eighth Amendment.  Plaintiff alleges he suffered chest pains en route and fell out

7    of his wheelchair to the asphalt road.  Plaintiff alleges he was then taken to the emergency room in

8    a van, where Dr. Jakes ordered a large dose of morphine for plaintiff's chest pains.

9    To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison

10   conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452

11   U.S. 337, 347 (1981).  A prisoner's claim of inadequate medical care does not rise to the level of an

12   Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal

13   civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate

14   indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett

15   v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)).  A prison official does not act in

16   a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to

17   inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

18   Defendant Grayson contends that she is entitled to summary adjudication on plaintiff's claim

19   against her because she at no time ordered plaintiff to self-propel to the CTC.  (Doc. 180, Grayson

20   Dec., ¶12.)  It is standard procedure that inmates needing to go to the CTC Emergency Rroom be

21   transported by vehicle.  (Undisputed Fact 11.)  During the day, when an inmate located at CSATF

22   requires nonemergency medical treatment at the CTC, one of the facility correctional officers is

23   contacted.  (U.F. 12.)  The facility correctional officer escorts the inmate to the CTC, and stays with

24   the inmate during the inmate's visit to the CTC.  (Id.)  After the inmate's medical appointment

25

26         [4] Plaintiff's third amended complaint is verified and shall be treated as an affidavit for purposes of the

27   summary judgment rule where it is based on facts within plaintiff's personal knowledge of admissible evidence, and
     not merely on plaintiff's belief.  Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).

28   Plaintiff's supplemental complaints and opposition are not verified and may not be treated as opposing affidavits.

1  and/or medical treatment at the CTC, the facility correctional officer will escort the inmate back to

2  CSATF. (U.F. 13.)  If an inmate is in a wheelchair and requires non-emergency medical treatment

3  at the CTC, a CTC transportation correctional officer is contacted.  (U.F. 14.)  The CTC

4  transportation correctional officer picks up the inmate and takes the inmate via vehicle from CSATF

5  to the CTC. (Id.)  After the inmate's medical appointment and/or medical treatment at the CTC, if

6  the inmate is in a wheelchair, the CTC transportation correctional officer is contacted to pick up the

7  inmate at the CTC and transport the inmate back via vehicle to CSATF. (U.F. 15.)

8         Inmates are at all times escorted between CSATF and the CTC by a correctional officer for

9  security purposes, and are prohibited from walking or self-propelling in a wheelchair to and from

10  CSATF and the CTC without an escort by a correctional officer. (U.F. 16.)  In addition, inmates

11  must be "processed" (i.e., required to go through metal detectors, and undergo an unclothed body

12  search) through several gates between CSATF and the CTC. (Id.)  An inmate would not be able to

13  be processed through these gates without being escorted by a correctional officer. (Id.)  If an inmate

14  requiring nonemergency treatment at the CTC wants to walk and/or self-propel in his wheelchair,

15  he may do so, but he must be escorted by a correctional officer at all times. (U.F. 17.)  Defendant

16  Grayson argues that plaintiff would not have been allowed to self-propel to the CTC by himself, and

17  she could not and would not have instructed him to do so.

18         The Court finds that defendant Grayson has met her initial burden of informing the Court of

19  the basis for her motion, and identifying those portions of the record which she believes demonstrate

20  the absence of a genuine issue of material fact.  The burden therefore shifts to plaintiff to establish

21  that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v.

22  Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As stated above, in attempting to establish the

23  existence of this factual dispute, plaintiff may not rely upon the mere allegations or denials of his

24  pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or

25  admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

26  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747,

27  749 (9th Cir. 1973).

28  ///

1   "Deliberate indifference is a high legal standard." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060

2   (9th Cir. 2004).  "Under this standard, the prison official must not only 'be aware of the facts from

3   which the inference could be drawn that a substantial risk of serious harm exists,' but that person

4   'must also draw the inference.'" <u>Id</u>. at 1057 (quoting <u>Farmer</u>, 511 U.S. at 837).  "'If a prison official

5   should have been aware of the risk, but was not, then the official has not violated the Eighth

6   Amendment, no matter how severe the risk.'" <u>Id</u>. (quoting <u>Gibson v. County of Washoe, Nevada</u>,

7   290 F.3d 1175, 1188 (9th Cir. 2002)).

8       Plaintiff's unverified opposition is accompanied by documentary evidence, most of which

9   are medical records, and the declaration of his wife, Barbara Dell'Antonia.  Although plaintiff argues

10  that defendant Grayson acted with deliberate indifference, plaintiff has not submitted any admissible

11  evidence that in November of 1999 he suffered from congestive heart failure or that in telling him

12  to self-propel 3/4 of a mile, defendant Grayson "[knew] of and disregard[ed] an excessive risk to

13  [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837.[5]  Even if the Court assumes for the sake of

14  argument that plaintiff had congestive heart failure, that defendant knew plaintiff had congestive

15  heart failure, and that defendant  told plaintiff to self-propel himself to the CTC three-quarters of a

16  mile away, plaintiff has not submitted any evidence that wheeling himself three-quarters of a mile

17  constituted an excessive risk to his health or that defendant was aware it constituted an excessive risk

18  to his health but ordered him to do it anyway.  As such, there is simply no evidence that defendant

19  Grayson violated plaintiff's rights under the Eighth Amendment by acting with deliberate

20  indifference to his medical condition, and defendant is entitled to summary adjudication on the claim

21  against her.

22

23      [5] Plaintiff offers Exhibit H to establish that he was seen at the CTC on November 12, 1999, and that on
    November 16, 1999, Dr. Jakes made a note in his medical file documenting that plaintiff had been told to wheel
24  himself to and from the CTC, and directing that he be transported to the CTC.  (Doc. 186, pg. 74.)  Defendants
    object to this exhibit for lack of foundation and lack of authenticity, and as containing hearsay.  Exhibit H is a page
25  from plaintiff's CDCR medical record and was also offered by defendants in support of their motion.  (Doc. 182-6,
    pg. 19.)  As such, defendants' objection to the record itself for lack of authenticity is rejected.  The Court finds the
26  objection simply not to be based in good faith.  However, the specific entry in the record plaintiff would have the
    Court rely upon is hearsay.  To the extent that the statement was purportedly made by defendant Grayson and would
27  be an admission, nothing in the record attributes the statement to Grayson.  As such, the entry is not admissible.
    Nevertheless, even if the Court did consider the entry made by Dr. Jakes as an admission, while it is evidence that
28  defendant made plaintiff self-propel to the CTC, it is not evidence that defendant possessed the requisite mental state
    of deliberate indifference.

2.   Excessive Force Claim Against Defendant Edger - 2000

Plaintiff alleges that on January 23, 2000, an emergency alarm was sounded because he was unconscious on the floor.  Plaintiff alleges that defendant Edger, an MTA and registered nurse, responded to the alarm and repeatedly struck plaintiff in the left arm with his fist.  Plaintiff was subsequently admitted to the infirmary, and alleges that he could not raise or use his left arm without great pain and was informed by numerous other inmates about defendant Edger's actions.  Plaintiff further alleges that the force used against him by defendant Edger caused him to need surgery on his left collar bone.

"What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [of the Eighth Amendment] depends upon the claim at issue . . . ." Hudson v. McMillian, 503 U.S. 1, 8 (1992).  "The objective component of an Eighth Amendment claim is . . . contextual and responsive to contemporary standards of decency." Id. (internal quotation marks and citations omitted).  The malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident. Id. at 9; see also Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) (Eighth Amendment excessive force standard examines de minimis uses of force, not de minimis injuries)).  However, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9.  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 9-10 (internal quotations marks and citations omitted).

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7.  "In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Id. (internal quotation marks and citations omitted).

17

1  "The absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end

2  it." Id.

3      On January 23, 2000, at approximately 4:42 p.m., defendant Edger responded to plaintiff's

4  dorm for an emergency medical call. (U.F. 20.)  Upon arriving at plaintiff's dorm, defendant found

5  plaintiff face down on the floor, unresponsive, and flushed. (U.F. 21.)  Defendant found an empty

6  nitroglycerin bottle lying on the floor, and then checked plaintiff, who was unresponsive. (U.F. 22.)

7  Defendant Edger, following the standard basic life support and advanced life support guidelines,

8  tapped plaintiff with his hand on plaintiff's left shoulder blade and asked, "Are you okay?  Are you

9  okay?" (U.F. 23.) Plaintiff became responsive shortly thereafter, and stated to defendant , "The last

10 thing I remember is this bolt of pain [in my chest]."  Plaintiff was then transported to the emergency

11 room for treatment. (U.F. 24.)  Defendant Edger contends that at no time did he hit plaintiff on his

12 shoulder or other body part with a closed or open fist, or hit plaintiff over and over again on his

13 shoulder, and is therefore entitled to summary adjudication as to plaintiff's claim against him. (Doc.

14 179, Edger Dec., ¶11.)

15     Defendant Edger has met his initial burden of informing the Court of the basis for his motion,

16 and identifying those portions of the record which he believes demonstrate the absence of a genuine

17 issue of material fact.  The burden therefore shifts to plaintiff to establish that a genuine issue as to

18 any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

19 574, 586 (1986).

20     Plaintiff has not submitted any admissible evidence in support of his claim that defendant

21 used excessive force against him by striking him repeatedly with an open and closed fist.  Plaintiff

22 was unconscious at the time and did not witness defendant striking him, and his assertion in his

23 complaint that he was told by other inmates that defendant Edger struck him repeatedly does not

24 itself constitute admissible evidence and is not supported by any admissible evidence.  Because the

25 record is devoid of evidence that defendant Edger repeatedly struck plaintiff in the shoulder,

26 defendant is entitled to summary adjudication on plaintiff's claim that defendant used excessive

27 force against him.

28 ///

1             3.    <u>Medical Care Claims Against Defendant Snow - 2001</u>

Finally, plaintiff alleges that defendant Snow, a physician, acted with deliberate indifference to his serious medical needs in 2001.  Plaintiff alleges that on March 7, 2001, defendant Snow told him that the Veterans' Administration Hospital had helped him far too much already, that there was no therapy available so he had better learn to live with the pain, and that she was taking away his wheelchair.  In addition, defendant Snow allegedly stopped most of plaintiff's cardiac medications.  On March 14, 2001, plaintiff alleges he saw defendant Snow again but she did not re-order his cardiac medications.  On June 21, 2001, plaintiff was allegedly taken to the CTC ER, where Dr. Nguyen s re-ordered plaintiff's cardiac medications and told plaintiff that he never should never have been taken off his medications.

"Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." <u>Toguchi</u>, 391 F.3d at 1057 (internal quotations and citation omitted).  Further, "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a s 1983 claim," <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted), and a difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference, <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989).  To prevail, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations omitted).

Turning first to the confiscation of the wheelchair, defendant Snow concedes that she requested the wheelchair be removed from plaintiff's use on March 7, 2001.[6] (U.F. 62.)  Defendant did not believe plaintiff  required a wheelchair or braces, and believed that he sat in wheelchairs

---

[6] Plaintiff points to what he asserts are discrepancies in the records cited to by defendant in support of her motion. (Doc. 186, Opp., 3:22-4:7.)  The two records at issue are different records.  One is "Physician's Orders" notes and the other is "Physician's Progress Notes."  The fact that defendant made the two entries on the same day but at different times does not cast suspicion on the records.  Finally, plaintiff's contention that defendant attested she made the entry on March 7, 2001, but the entry is dated March 8, 2001, is incorrect.  Defendant attested that on March 8, 2001, she recorded the March 7, 2001, decision to confiscate plaintiff's wheelchair. (Doc. 182-1, Snow Dec., ¶24.)

when he could get them, until his muscles atrophied. (U.F. 61.)  Defendant believed sitting was

causing the deconditioning of plaintiff's lungs and heart, as plaintiff had chronic obstructive lung

disease and very high cholesterol. (Id.) On March 8, 2001, when she saw plaintiff, defendant urged

plaintiff to walk as often as possible to improve his muscles, heart and lungs, as she felt that this

would much improve his overall physical conditions, including his weight and cholesterol issues.

(U.F. 65.)

Plaintiff, as a lay witness, is not competent to testify as to the medical diagnoses of his

problems or the appropriate treatment, although plaintiff is qualified to testify to general symptoms,

etc.  Likewise, plaintiff's wife, declarant Barbara Dell'Antonia, is not qualified to testify as to

plaintiff's medical diagnoses or medical needs.  In this instance, plaintiff has not tendered any

admissible evidence that he had a medical need for a wheelchair and the removal of his wheelchair

was therefore an act of deliberate indifference.  To the extent that other health care providers may

have provided plaintiff with a wheelchair, plaintiff's disagreement with defendant Snow's decision

amounts to nothing more than a disagreement with her chosen course of treatment, which is

insufficient to support an Eighth Amendment claim.  Further, plaintiff has not tendered any

admissible evidence that defendant Snow, in having his wheelchair removed, "[knew] of and

disregard[ed] an excessive risk to [plaintiff's] health or safety."  Farmer, 511 U.S. at 837.

Defendant, as a medical doctor, has offered evidence that in her medical opinion, the use of the

wheelchair was detrimental to plaintiff's health and that she did not believe he required the use of

one.  Plaintiff's disagreement with her assessment does not support a claim for violation of the

Eighth Amendment, and defendant is entitled to summary adjudication.

Plaintiff next alleges that defendant failed to reorder his cardiac medications on March 14,

2001, resulting in his transport to the CTC on June 21, 2001, where Dr. Nguyen stated he should not

have been taken off the medications.

By the beginning of March 2001, defendant Snow had reviewed all of plaintiff's medical

records from the prison files.[7]  (U.F. 59.)  Defendant Snow suspected he was using his heart

---

[7] Although plaintiff quibbles with whether or not defendant could have reviewed *all* of his files, plaintiff submitted no evidence bringing this fact into dispute.

1   medications to create his abnormal vital signs of low blood pressure and fast heart beat. (U.F. 60.)

2   Defendant Snow believed plaintiff would not take his Digoxin. (Id.) Plaintiff's blood levels were

3   always low when he went to a hospital, but normal when he came back. (Id.) His abnormal blood

4   pressures and pulses would also be normal with observation time and immediately after hospital

5   discharge. (Id.)

6       Defendant Snow saw plaintiff on March 8, 2001, by appointment. (U.F. 63.) Defendant

7   Snow had apprized Captain Frazier that plaintiff had a medical psychiatric problem that caused him

8   to fabricate a lot. (Id.) Captain Frazier accompanied defendant Snow to clinic and plaintiff was

9   confronted by defendant with some of the realities from his medical records at the time (no testicle

10  cancer, no radiation for cancer, no surgery for cancer, no non-functioning knees requiring a

11  wheelchair or braces, no heart disease, heart attacks). (Id.) Defendant Snow advised that plaintiff

12  needed to begin that day to give only factual medical history. (Id.) Defendant Snow told plaintiff

13  he would not be allowed to take his Digoxin on his own but would have to go to pill line to take it

14  in front of a nurse/MTA, who would make sure he swallowed it. (Id.)

15      On April 17th and 18th of 2001, the MTA recorded plaintiff's angry claim that he filed a

16  "restraining order," which he had no copy of. (U.F. 66.) Plaintiff then missed his April 18, 2001,

17  appointment with defendant Snow and did not receive his pulmonary (COPD) referral which

18  defendant had arranged to treat his real diseases (lung and lipid). (Id.) Between March 5, 2001, and

19  May 10, 2001, plaintiff did not get admitted to any treatment center (ER, clinic, hospital) for chest

20  pain. (U.F. 67.) On May 10, 2001, plaintiff claimed that he fainted. (Id.) Defendant Snow

21  continued all his cardiac medications and added two medications - lopid and pravachol to lower his

22  blood lipids. (Id.) Defendant Snow discontinued Isordil which she believed caused the fainting

23  episode, and ordered six blood pressure measurements on the yard. (U.F. 68.) Plaintiff did not show

24  up for the blood pressure checks and requested transfer to another yard, which occurred on July 30,

25  2001. (U.F. 68, 69.)

26      Plaintiff was examined and treated numerous times for his complaints of his heart, shoulder,

27  and other health issues, and he was further seen by doctors and specialists on several occasions

28  between 1999 and 2004. (U.F. 72.) During 1999 and 2004, plaintiff's medical condition and various

1  health issues were carefully monitored and treated by several physicians, including defendant Snow,

2  both inside and outside the institution.  (<u>Id</u>.)  In six years of intensive investigation by multiple

3  specialists, no heart disease was found up to 2004.  (<u>Id</u>.)

4          Defendant Snow has met her initial burden of informing the Court of the basis for her

5  motion, and identifying those portions of the record which she believes demonstrate the absence of

6  a genuine issue of material fact.  The burden therefore shifts to plaintiff to establish that a genuine

7  issue as to any material fact actually does exist.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

8  <u>Corp.</u>, 475 U.S. 574, 586 (1986).  Plaintiff must do more than attack the credibility of defendants'

9  evidence.  <u>See</u> <u>National Union Fire. Ins. Co. v. Argonaut Ins. Co.</u>, 701 F.2d 95, 97 (9th Cir. 1983)

10  ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her

11  credibility suffices to avert . . . judgment.").

12          Plaintiff has not submitted any admissible evidence that between March and June of 2001

13  he suffered from a serious medical condition for which he required certain medications, and those

14  medications were not provided for him by defendant, leading to injury to plaintiff.  Plaintiff is not

15  qualified to opine that he suffered from a condition which required cardiac medications, or that

16  medications discontinued by defendant Snow were cardiac medications and were necessary to treat

17  his cardiac condition.  Plaintiff's conclusory allegations in his complaint, while sufficient to state

18  a claim under federal notice pleading standards, are not sufficient to raise a triable issue of material

19  fact at this stage in the litigation.  Plaintiff has submitted no evidence that defendant Snow acted with

20  deliberate indifference to a serious medical need (cardiac condition) and that plaintiff suffered an

21  injury as a result.  Defendant Snow is therefore entitled to judgment as a matter of law on plaintiff's

22  Eighth Amendment claims against her.

23          E.    <u>Conclusion</u>

24          For the foregoing reasons, the Court finds that plaintiff has not met his burden of setting forth

25  sufficient admissible evidence to raise triable issues of material fact, and defendants are entitled to

26  judgment as a matter of law on the claims against them.  Because the Court finds defendants are

27  entitled to summary judgment on the merits of plaintiff's claims, the Court does not reach

28  ///

1  defendants' qualified immunity arguments.  Accordingly, based on the foregoing, it is HEREBY

2  ORDERED that:

3      1.      Plaintiff's surreply, filed May 30, 2006, and plaintiff's supplemental opposition, filed

4              December 4, 2006, are STRICKEN from the record;

5      2.      Defendants' motion for summary judgment, filed April 17, 2006, is GRANTED, thus

6              concluding this action in its entirety; and

7      3.      The Clerk of the Court shall enter judgment for defendants and against plaintiff.

9  IT IS SO ORDERED.

10 **Dated:   March 14, 2007**              **/s/ Lawrence J. O'Neill**
   b9ed48                            UNITED STATES DISTRICT JUDGE